THIS is a bill filed by the devisees, who were also heirs of Robert Saunders, deceased, against his three executors, to'compel the settlement and . distribution of a large estate of the decedent. The court below dismissed the bill with costs ; from which decree the heirs and devisees aforesaid have appealed. The will was proved, and letters testamentary granted in 1805. By its directions, no final distribution was to he made till the youngest son came of age, which was about thirteen years. At the end of about fourteen years and one half, this bill was filed, there having been no previous settlement made of the executorial accounts, with the county court which granted the letters testamentary. Immediately on the service of process in this suit, the executors made an application to the county court for a settlement. Commissioners were accordingly appointed, who reported a separate settle, xnent with each executor, which was approved and re, corded. The executors then filed their answers, red *316 dering no other account than what this settlement exhibited, and relying upon it as a full adjustment of the matters claimed in the bill. I'his settlement showed no balance in favor of the appellants, and was made entirely cx parte, and without their presence or concurrence. The appellants objected to it; 1st. as proving nothing when made under the foregoing circumstances; and 2dly. ifit was admitted, it was wholly incorrect in many items and parts, and that it was unintelligible. and did not include much of the matter in controversy. The court below overruled both these grounds and made it the base of the decree, and left it undisturbed in every respect.
We shall consider the validity of the first of these objections to the report; for if that be with the appellants, it is clear that the decree cannot be sustained.
it is a settled doctrine in this court, first established in the case of Wooldridge’s heirs vs. Watkins’ executor, &c. 3 Bibb 349. and followed in many subse. quenl cases, that the settlement of accounts by an executor or administrator with the county court, may be used as evidence prima facie, in a contest with the lieirs or devisees, and this doctrine has also been applied to controversies with creditors. Burnes vs. Burton, 1 Mar. 349. And, indeed, the doctrine is reason, able; for it could not be reasonable to require the executor, both by oath and bond, to account with that pourt, and give it no efficacy in his favor, when rendered. Besides, if the rule was not indulged, executors and administrators could often obtain no kind of quietus, unless they were sued in a court of equity. But, however reasonable and proper this rule may be, itoughtnottobe universa!,and ought to besubject to exceptions. If it were not so,an executor or administrator who was artful and fraudulent, might, by such ex parle proceeding, obtain many unfair advantages, to the detriment and g”eat injury of the heir or distribu, tee, which could never thereafter be taken from him. In this case, the heirs or devisees had applied to a court of equity, which had competent and complete jurisdiction of the whole matter, and could settle, the ac. counts after hearing both parties, and where in the form of legal contro versy, with proper parties before it, interested to prove and disprove their respective claims, complete justice might be done. It is hard to *317 Conceive a motive for declining the fair and equal terms proposed by such a tribunal, and then, for the first time, appealing to the county court, unless it is the belief that something might be gained in that way, which could not be had before the chancellor. Hence it is correct to make a settlement with the county court obtained under such circumstances, an exception to the general rule, and to attach to it no validity, and thereby compel the parties to abide by that tribunal, which was first appealed to,and always hears both sides of the contest. There is nothing novel in such a principle. The authority of-both the chancellor and the county court, is concurrent in this matter; and among concurrent authorities, the first which possesses itself of the controversy, may retain and end it, and cannot be ousted b> the, subsequent interference of the other, which then attempts to take up the matter. Hence the first suit before the tribunal first appealed to, may be used to abate the seconds ‘before the last which attempts to interfere. As tlje county court in this and like cases,then, proceeds ex parte, an<l affords no opportunity to the opposite side to attempt to ábate the proceedings, it is but fair to, a flow the plea, after the party appealing to the county court has gone the whole length of the controversy, and to attach to the proceedings no efficacy whatever. Such^'in principle, is the doctrine maintained by the court of appeals' of Virginia, under laws precisely ¿the samp,pith ours, in the case of Anderson & Spark vs. Fox &c. 2 Hen. and Mum. 245, cited at bar. If this doctrine be not correct, the jurisdiction of the chancellor over the estate of decedents, may, in almost every instance, be evaded, and settlements, where one side alone may be heard, will be obtained, and the chancellor left to act the part of a revising court, after the onus probqndi is shifted, and that after the chancellor had possession of the case, entirely on different shoulders from those on which it lay when the parties first came before him. The principles now adopted, will leave executors and administrators quietly to settle their accounts, in due time, before controversy arises, when they have less motive to act improperly; and after controversy commences,' R will compel them to confront their adversary, where every account may pass the proper ordeal. It has been contended in argument, that the case of Burnes *318 vs Burton, before cited, goes far enough in principle to support this settlement; because that was the case of a creditor suing for his demand, before a court of la\V, against whom a settlement before a county court, made after action brought, was admitted as evidence primafade, that the administrator, defendant, had fully administered. It must be acknowledged, that that case does go as far in giving validity and effect to such county court settlements, as the principle ought ever to be extended. But without shaking the authority of that case, it is one, where the accounts of the executor or administrator only came collaterally into controversy before a court of law, in a form of action not brought to liquidate the accounts. If the creditor in that case had brought his suit in equity for a full settlement of the administration accounts, and a disclosure of assets, out of which his debt might be satisfied, and had thus made a settlement one of the direct objects of bis suit, the account settled with the county court, after suit brought,, might have been treated very differently.
It follows, therefore, that the court below erred in giving any validity to this account, and that the defendants must be compelled to account, de novo, before that court. In taking this account, the inventory and appraisement, as it is not impeached, ought to be taken as the data, except so far as the prices of the articles therein contained which have been sold, are varied by the sale. To it likewise ought to he added, all moneys due to the decedent at his death, and collected by his executors, and all the profits of his estate since made, or which might, on using reasonable diligence, have been made, in cases where the executors, by culpable negligence, failed to make it profitable. Interest, sotaras it was received or the money was used, ougiit, likewise, to be charged against them. Some of the estate was to be specifically preserved, and considerable power over it is given to the executors by the will, which must be regarded in settling the account; and as the court below refused to go into the account, it is evident, that many questions must arise in its details, which cannot be reached by any decree or directions which this court can now give. On this, branch of the subject, however, some of tlio most ijin. *319 portant questions in the cause present themselves, and must now be the subject of our inquiries.'
By the will, none of his slaves are directed to be sold. Some of them are specifically devised to his children. These were to be kept together, upon the farm, until his youngest son came óf age, together with another family of slaves, which were not to be hired at all. Gatewood, one of the executors, was requested by the will, to live upon the farm, and keep the children together, until the youngest son came of age. For the first year’s residence, he was to-receive two hundred and fifty dollars, “ as a compensation for his services and attention to his children, business and family; and for the succeeding years that-he might remain in the house, the executors might make such compensation. as they in their judgment, might think right and proper.” After the first, year expired, the remaining executors entered into a contract witli him, agreeing that he should still reside there until the youngest son came of age, for two hundred and fifty dollars annually, he to have the privilege of keeping one brood mare on the farm, but not to keep her colts there, after they were three years old ; and he was also allowed to feed and clothe his family with the proceeds of the farm, and still keep the children of the decedent. He continued in this contract accordingly, until the youngest son came of age. During this pe. riod, a large quantity of stock appears to have been on the place, as well as the slaves, belonging to the estate.
We conceive that, for this period, he ought to account for the profits actually made frpm the farm, after the sustenance of himself and family including the decedent’s children, and his wages, are deducted ; and the estate there at that period, ought to be accounted for, as well as the hire of the slaves directed by the will to be hired.
In settling the principles on which the estate is to be settled, one or two other questions occur, which have occupied the greatest part of this controversy. It is alleged that Saunders, at his death, possessed a slave named Sarah, and two children then living, and she, since that time, has had three more children, the hire of which the executors had failed to bring into the account, or to distribute the slaves theiriselves. Gate-wood sets up title to these slaves, as belonging to his *320 wife whew he married her, she being the sister of the wife of the testator, and having lived in his family some years before she was married. He' alleges that Valentine L. Wharton, the father of his wife and father. Jn.Iawof the testator, had done labor for the testator in building him a brick house, and keeping a tavern for him, or rendering other services; that at his death he devised all hisopen accounts and debts to his daughter Fanny, nowthe wife, of Gatewood, arid among the rest the debt-due from Saunders; and he accordingly exhibits the will of V. L. Wharton, and alleges that Benjamin Wharton, his son, administered on the estate, and set up a claim against the testator, Saunders, for the services of his father-in-law, V. L. Wharton, and that referees were appointed between them, to settle the account; and that after these referees had proceeded to settle the account, Saunders proposed that he would give the girl Sarah, to Fanny Wharton, then sole, and that thereby the accounts should be closed, whatever was due being devised to her by the will; that both she and the administrator had assented to that arrangement, Sarah then being a small girl, but since had become the mother of the other slaves. He further charges, that he was informed, before the marriage, that the slave belonged to his intended wife; that after he married and went to house-keeping, Saunders, the testator, did not send the negro along, but then proposed to keep the slave, and pay for her in lands, to which he, Gatewood, assented; but that Saunders never gave him the lands, or any writing therefor, al. though he lived four years after the marriage : That after he came into possession of the slave as executor, he refused to hold Sarah as executor, or under the will, but set up a claim to her in right of his wife, and brought an action of detinue for her, and recovered her, against the co.executors; and he pleads and relies upon said record as a bar to this claim : And also, if the record is insufficient, he relies on the proof of his title by other testimony.
The admission of this record, as concluding the title, and precluding all inquiries into matters which previously existed, affecting the title, is objected to, and forms a question for the decision of this eourt.
Records of recoveries against executors by strangers, must he evidence against the heirs or devisees; *321 but whether they be conclusive, where no fraud is alleged, or only prima facie, we need not now enquire; for this is a record of a recovery by one executor against his co-executors, where the law allows of no action touching the estate. Qr. rather, the action is still more singular. It is brought in the na.me of Gate-wood and wife, against himself, and also his co.execu. tors, and was defended by one of the others, all having pleaded the general issue. How Gatewood himself could thus attempt to drive on the controversy with one hand and check its motion with the other, we leave to those who are disposed to deaLin legal experiment orv an untried scale, when there is no precedent to guide them. What is more, Gatewood; at the time of tiie suit and ever after the death of the testator, held the exclusive possession of Sarah and her children, as admitted in this record; and, therefore, the recovery could not change the title or possession in any shape. It must have been an arrangement among the executors, that, to try the title, one should sue and the others defend. -The law knows of no such action, and the only redress that one could have, under such circumstances, is a suit in equity, to which the devisees as well as the other executors, might be made parties, and a decree obtained, quieting the claim, exempting the executor claiming from holding the estate in his fiduciary character, or accounting for the profits. It is a well settled principle, that-executors, however numerous, are considered in law as one representa ive, and each has full power over the estate of the decedent. ■Whatever causes of action they might have against the testator, are, in general, extinguished by their assuming the executorship, whether such causes of action be several or not; and at common law, causes of action existing against them in favor of their testator, were likewise extinguished by their becoming execu, tors. Heuce, it follows, that if Gatewood had cause of action against Saunders, for the slave and her offspring in question, it was extinguished at law by his becoming executor, and it was not competent for the remaining executors to coin such an action, by any arrangement or agreement.
In cases where all the executors are not joined in actions by or against strangers, it may be matter of abatement only; and although the abatement may not *322 be taken advantage of, the verdict and judgment may be good evidence, and conclusive as to the right between parties and privies ; but this is not a case proper for a plea in abatement only. There was, in a court of law, no action, and the court had no jurisdiction for the want of proper parties ; and it is essential, to make a verdict and judgment, evidence, that the court in which it was rendered, should have jurisdiction of the subject matter, between proper parties, in that form of action—Philips’ Evid. 234; Burden vs. Fitch, 15 Johnson 121.
It is clear, therefore, that the verdict and judgment relied on in this case, proved nothing as to the right of the parties, it also clearly follows, that the deposition of Hutchinson, which was taken to be read as evidence on that trial at law, which was offered, objected to, and admitted on the hearing of this cause, ought to have been rejected as incompetent.
But it docs net follow from this decision, that Gate-wood cannot set up his original title, if he has one, and retain the slave. If Saunders owed him a debt, he might retain it. out of the assets which came, to his hands 5 and, for the same reason, he ought to be allowed to retain in his possession, as his own, any specific chattel held by Saunders, which came to hispos. session as executor,‘and which he might have recovered in ah action of detinue, but could not, because his becoming executor extinguished his cause of action.
This leads us back to determine the merits of his title on the remaining proof offered in its support.
It is very evident from, the proof, that Valentine L. "Wharton was the undertaker of, and chief mechan ic in building the bouse 'of Saunders, and "that he also kept a tavern for Saunders, on hiré¡. From the relation existing between the parties, it can hardly be said, that ihe parties kept any regular account against each other, or that they measured their dealings, as in ordinary cases, by dollars and cents ; but it was, no doubt, understood between them, that remuneration should bo made, without nice calculation for any articles sold or services rendered by one to the other. It is attempted to be shown, that Saunders furnished money to bring Wharton to this country; but this chiefly rests upon the-declarations of Saunders, which were frequent ly inconsistent with each other, and are not *323 evidence in favor of his representatives in this suit. It is also attempted to rebut these services, by the entertainment and support of Y~ L. Wharton and his family, for some time, about the house of Saunders. This cannot be admitted as sufficient. From the connexion between the parties, the presumption is violent, that this was done out of ordinary civility and hospitality; especially, when there is no proof conducing tó show any different understanding between the parties.
It is natural that V. L. Wharton should desire to furnish Fanny with a slave,, as he had done to his other children. Hence, the subject appears to have been spoken of in the family of Saunders, before the death of Wharton. It seems also clear, that Benjamin Wharton, the administrator of Valentine L. Wharton, did claim an account against Saunders, after the death of Wharton, which Saunders did not controvert, but silenced it by promising the negro to Fanny Wharton, for whose benefit the account, when established, was to operate- This satisfied the administrator and all concerned. We have not, therefore, thought it necessary to enquire into what operation the doctrines of the law relative to gifts, where the donee had or had not possession, has upon this case; for we consider if as a contract on the part of Saunders, based ón a valuable consideration ; to wit, the extinguishment of the claims against him in favor of FannyWharton’s father’s estate, to furnish her with the negro. We do not, however, conceive that the proof, makes out an executed contract, but only an executory agreement as to the possession. ’ The testimony of Benjamin Wharton, with whom, as administrator,’as well as Fanny, the legatee, it was máde, goes to prove the original transaction, and is as strong and explicit as that of any other witness, and indeed inore so ; for others, for fhe most part, detail partial acknowledgments, when there was no motive to detail the whole ; and sometimes, disclose the vanity of Saunders in hours' of intoxication, in endeavoring to represent the transaction as a,gift to Fanny, rather than the discharge of a debt or duty resulting from the bequest of her father. He states clearly, that the engagement of Saunders was, (< that when Fanny married or left his house, §arah should be her’s.” In like manner, when Faviny *324 was called forward to assent to the matter, Saunders then stated, that her brother Benjamin and he had settled their accounts relative to the estáte of her father, and when she married or left his' family, “ Sarah should be her’s.” She at once expressed her satisfaction. Some one of the referees suggested the propriety of putting the matter1 to writing, and it was concluded, both by B Wharton and Saunders, to be unnecessary. It is, therefore, evident, that Saunders was motto part with the slave, until one of the events happened (in w|nich the slave was promised, and Fanny was not entitled to her until her marriage, which happened about two or three years afterwards. But taking the contract thus, it is clear, 'according to the doctrine recognized by this court in. the case of M’Dowell vs. Hall, that Gatewood and wife might, on their marriage, have maintained their action of detinue against Saunders, to coerCe, specifically, this'contract, and recover the slaved Nor do we conceive that the promise of Saunders to pay land for the slave, as stated in the answer of Gatewood, and admitted also by Saunders in some of his confessions, destroyed the right of action. That was an agreement which Saunders might or might not fulfil, at pleasure, and it could not have been successfully relied on as a bar to the action. It follows, then, from the principles assumed, that Gatewood might have recovered the slave at the death of Saunders, and that his right, on his.first possession as executor, was not barred by lapse of time or any other valid defence shown in the cause, and, of course, that he had a right then to do himself justice, by retaining the slave as his own, and that she ought not to he brought into account or be made subject to distribution. ’
Another question presented, is a horse, which was likcwise recovered by Gatewood in the action of detinue, the record of which we have rejected. The record can give him no right thereto. But oil this point we deem the proof clear, that the horse'was bought and owned by Valentine L. Wharton ; that Saunders received compensation for raising him ; that he is the same devised to Fanny Wharton in the will of her fan ther ; that he remained with Saunders, as herss, until Saunders sold him. Bis estate ought, therefore, .ta account for the value of him when sold,
*325 It is also assigned for error,'that the deposition of John Thompson, one of the executors and defendants in the suit, was admitted as evidence. Thompson was one of the most active of tlie executors, and is directly responsible for all the estate which came to his hands, out of his own proper estate. His deposition was tak. en by Gatewood ; but it is designed tó Bear directly on the settlement of the estate, in which he is directly interested. If he was competent to be sworn at all, On any point, he was competent throughout, as to every matter that was properly joined in jhe bill. Wé cannot, therefore, perceive the principle on which his testimony was admitted, or how it can be excepted from the rule, which rejects the-testimony' Of interested parties to any controversy. His deposition must, theréfore, b.é excluded, as iucompeteut.
. On examining the testimony, it is evident that two ©f the children of Sarah were born at the death of Saunders, and the presumption is strongs that one at least was born at the marriage of Gatewood. The question.' therefore, presents itself, is Gatewood entitled to the increásé of Sarah, bon» before Saunders was to deliver her, or to that born afterwards and before Gatewood obtained the possession, inasmuch as his title was founded op an executory contract, which could have been, but was not sooner enforced by any appropriate action ? ' ' ‘ •
It is clear, that the contract was complete, except the possession, and thai was delayed because Fanny Wharton had nqt then the need of the exclusive and separate use of the slave. Saunders had received the consideration, and the slave was specifically designated aiid set apart, to discharge the agreem'eiit. The title of the slave must, therefore, have passed to Fanny‘át the time the slave was set apart by'Saunders and agreed to be taken by her and the administrator of V, L. Wharton ; for it is a settled role of the common law, and must apply in every case where statutory provisions do not control it, that as soon as a bargain is struck', in relation to a purchase and sale in-' tended to be closed at that moment, the property of the goods is transferred to the vendee, and that of the price to the vendor — 2 Black. Com. 448. If this rule applies where the consideration is not paid, but only agreed to be paid, it ought to embrace this case, where *326 the consideration had previously passed ; and if this principle prevails at law, it ought to be good in chant eery, where that which is engaged tobe done, is considered, frequently, as actually performed. It then follows, that this slave belonged to the wife of Gate-wood from the time of the engagement; and, of course, her increase, must go with the mother, and Gatewood is not bound 1o account for either the profits or increase, or to distribute the slaves themselves. We do not conceive that his acts as executor have precluded' him from retaining the property. True, the slave • was placed in the inventory ; but in doing this, the remaining executors had the control, and Gatewood soon showed bis disapprobation by inventing an action at law to retain her; and although we have said that the record of this action is no evidence of title, yet it may be used to show that Gatewood intended to do himself just ice, by retaining the slaves, and that he refused to hold them as executor.
The decree, however, must, for the previous reasons assigned, be reversed with costs, and the cause re. inanded, that a proper account may he taken, and such decree rendered as equity may require.